IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
ALBANY DIVISION

| | | |
|---|---|---|
| TODRICK STREET, | : | |
| Plaintiff, | : | |
| v. | : | Case No. 1:09-CV-197 (WLS) |
| UNITED PARCEL SERVICE, INC., | : | |
| Defendant. | : | |

## ORDER

Presently pending before the Court is Defendant United Parcel Service, Inc.'s ("UPS") Motion for Summary Judgment (Doc. 18). For the following reasons, Defendant UPS's Motion for Summary Judgment (Doc. 18) is **GRANTED**.

### A. JURISDICTION AND VENUE

The Court's subject matter jurisdiction in this action is predicated on a federal question pursuant to 28 U.S.C. § 1331. (Doc. 1, at ¶ 5-6). No challenge is made to the personal jurisdiction over the parties or the appropriateness of venue; which is proper pursuant to 28 U.S.C. 1391, both of which are supported by the facts of this case.

### B. SUMMARY JUDGMENT STANDARD

Pursuant to Fed. R. Civ. P. 56, summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). An issue is "genuine" if the quantum and quality of proof necessary to support liability under the claim is raised. Allen v. Tyson Foods, 121 F.3d 642, 646 (11th Cir. 1997). A fact is "material"

if it hinges on the substantive law at issue and it might affect the outcome of the nonmoving party's claim. Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986); *see also* Allen, 121 F.3d at 646.

On a motion for summary judgment, the Court must view all the evidence and all factual inferences drawn therefrom in the light most favorable to the nonmoving party and determine whether that evidence could reasonably sustain a jury verdict. *See* Celotex, 477 U.S. at 322-23; Allen, 121 F.3d at 646. The movant bears the initial burden of showing that there is no genuine issue of material fact. *See* id. at 323. The movant can meet this burden by presenting evidence showing there is no dispute of material fact or by pointing out to the district court that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *See* id. at 322-24. Once the movant has met his burden, the nonmoving party is required "to go beyond the pleadings" and identify "specific facts showing that there is a genuine issue for trial." Id. at 324. A judgment is appropriate "as a matter of law" when the nonmoving party has failed to meet its burden of persuading the Court on an essential element of the claim. *See* Cleveland v. Policy Management Sys. Corp., 526 U.S. 795, 804 (1999); Celotex, 477 U.S. at 323. To avoid summary judgment, the nonmoving party must do more than summarily deny the allegations or 'show that there is some metaphysical doubt as to the material facts." Matsuhita Elec. Indus. Co. v. Zenith Radio Corp., 418 U.S. 574, 586 (1986).

### C. FACTS AND PROCEDURAL HISTORY

To the extent that any party submits argument in support of or in opposition to a motion for summary judgment, to establish that a fact either cannot be or is genuine, the party may only do so by citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits, declarations, stipulations, admissions, interrogatory

answers, or other materials. *See* Fed.R.Civ.P. 56(c)(1). While a court may consider other materials in the record, the Federal Rules of Civil Procedure only require the court to consider factual materials to which it has been properly referred by citation. *See* Fed.R.Civ.P. 56(c)(1) & (3). If a party fails to properly support an assertion or fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may, *inter alia,* consider the fact undisputed for purposes of the motion and grant summary judgment if the motion and supporting materials, including the facts considered undisputed, show that the movant is entitled to it. Fed.R.Civ.P. 56(e).

Pursuant to Local Rule 56, "[a]ll material facts contained in the moving party's statement which are not specifically controverted by specific citation to the record shall be deemed to have been admitted, unless otherwise inappropriate. The response that a party has insufficient knowledge to admit or deny is not an acceptable response unless the party has complied with the provisions of Rule 56(f) of the Federal Rules of Civil Procedure."[1] In light of the foregoing, the Court has carefully considered all deposition excerpts and documents submitted in support of and in opposition to the motion. The submissions of the parties,[2] viewed in the light most favorable to the non-moving party, establish the following facts relevant to the issues raised by Defendant's Motion:

Plaintiff Todrick Street instituted this Title VII action based on the alleged discriminatory acts of his former employer UPS on December 23, 2009. (Doc. 1). UPS is a package delivery

---

[1] The Court notes Defendant's Objection to the form and substance of Plaintiff's Response to UPS's SUMF. (Doc. 48).

[2] The following summary of relevant facts contains the undisputed facts derived from (i) the Complaint (Doc. 1), Defendant's Answer (Doc. 3), Defendant's Statement of Material Facts as to Which There is No Genuine Issue (Doc. 19), and Plaintiff's Response thereto (Doc. 31), which were submitted pursuant to Local Rule 56. Where relevant, the factual summary also contains undisputed and disputed facts derived from the pleadings, the discovery and disclosure materials on file, and any affidavits, all of which are construed in a light most favorable to Plaintiff as the nonmoving party. *See* Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Fed. R. Civ. P. 56.

3

company engaged in package delivery around the world headquartered in Atlanta, Georgia. (Doc. 19 at ¶ 1-2). Employees who work at a UPS package center are generally responsible for the pickup and delivery of packages in a particular geographic area and those working in an UPS hub are responsible for routing packages to and from package centers and other hubs. (Id. at ¶ 3-4). Package pickups and deliveries are made by UPS Package Car Drivers in the familiar brown vehicles known as "package cars." (Id. at ¶ 5).

Plaintiff, and all UPS non-administrative, hourly employees are in a bargaining unit represented by the International Brotherhood of Teamsters (the "Teamsters" or "Union"). (Id. at ¶ 7). The employment of all UPS non-administrative, hourly employees is governed by the terms of a collective bargaining agreement ("CBA") between UPS and the Teamsters. (Id.). Employment discrimination, retaliation and harassment are strictly prohibited at UPS by the rules of the EEO and the CBA between UPS and the Teamsters. (Id. at ¶ 8-9).

Plaintiff, who is African-American, was hired by UPS in 1994. (Id. at ¶ 10). While employed with UPS, Plaintiff did not have a disability. (Id. at ¶ 75). During his time at UPS Plaintiff did suffer several injuries, including injuries arising from a motorcycle accident and four different on-the-job injuries. (Docs. 35, 19 at ¶ 76). Plaintiff returned to his job as a Package Car Driver after each injury but was placed on a list of "high risk employees." (Doc. 19 at ¶ 77). There were at least four of the other employees from the Albany package center whose names were also on the list of "high risk" employees and all are still employed by UPS as package car drivers. (Id. at ¶77).

The conditions of Plaintiff's employment with UPS were governed by the CBA. (Id. at ¶ 11). From 2001 until his termination on March 22, 2007, Plaintiff was employed as a Package Car Driver in the UPS package center located in Albany, Georgia. (Id. at ¶ 12). As a Package

4

Car Driver, Plaintiff operated a package car and was responsible for making pickups and deliveries of packages in a timely and safe manner. (Id. at ¶ 13). As a Package Car Driver, Plaintiff reported directly to an On-Road Supervisor, though the specific individual to whom he reported varied from day to day. (Id. at ¶ 14). The UPS On-Road Supervisors reported to the Business Manager of the package center. (Id. at ¶ 15). From mid-2006 until Plaintiff's termination in March 2007, David Bass was the Business Manager for UPS's Albany, Georgia package center and was responsible for the overall management of the center. (Id. at ¶¶ 16-17). As a Package Car Driver, Plaintiff was expected to follow methods and procedures related to the proper way to deliver packages. (Id. at ¶ 19). As a Package Car Driver, Plaintiff was expected to follow safety-related methods that related to both the operation of his package car and the use of proper body mechanics for physical tasks such as picking up and moving packages. (Id. at ¶ 20). There is no evidence that Plaintiff failed to follow safety related methods in the operation of his package car and the use of proper body mechanics and Plaintiff was not terminated for any related operation deficiencies. (Doc. 31 at ¶ 2).

As a Package Car Driver, Plaintiff was required to follow specific policies and procedures for reporting any accidents he had while driving his package car, as well as for reporting any damage to or problems with the package car. (Id. at ¶ 22). At the time of Plaintiff's termination in March 2007, when a Package Car Driver had an accident involving his package car, Company policy and the CBA required that the driver immediately report the accident by calling the package center and notifying a supervisor or manager. (Id. at ¶ 23). Article 52 of the CBA between UPS and the Teamsters provided that bargaining unit employees could be terminated immediately for committing any of eight "cardinal sins," one of which was failure to report an accident. (Id. at ¶ 24).

5

Package Car Drivers were also required to complete a DVIR every day after finishing their route and completing a post-trip inspection of their package car to identify any mechanical problems or damage to the vehicle. (Id. at ¶¶ 25-31). At the time of Plaintiff's termination in March 2007, there were different procedures a Package Car Driver must follow if he had an accident, an immediate reporting requirement, versus when a driver encountered an issue or problem with his package car that was not the result of an accident. (Id.) Non-accident issues were required for disclosure on the Driver Vehicle Inspection Report, or DVIR. (Id.).

An accident is a situation in which a UPS vehicle comes into contact with a person or a piece of property and causes damage as a result of the contact. (Id. at ¶ 72). Under the terms of the CBA, a Package Car Driver who failed to report an accident was subject to immediate termination. (Id. at ¶ 25). One of the primary purposes of the requirement that Package Car Drivers immediately report all accidents to a supervisor or manager was to enable the Company to take prompt action in response to the accident, such as notifying its insurance carrier, investigating the cause of the accident, and taking appropriate steps to rectify any property damage resulting from the accident. (Id. at ¶ 24).

There were occasions where other employees did not follow these procedures to the letter and were not terminated. (Id. at ¶ 25). Phyllis McFay is a white female Package Car Driver in the Albany package center. (Id. at ¶ 64). On the evening of February 28, 2007, McFay was finishing her delivery route when a tree limb scraped her package car. (Id. at ¶ 65). McFay believes that she was not aware that her package car had come into contact with anything other than the tree branch because it was dark outside. (Id. at ¶¶ 65-66). McFay did not immediately report the February 28, 2007 incident involving the tree branch, but upon her return to the package center at the conclusion of her route, she performed her daily post-trip inspection of her

6

vehicle, found that her driver-side window was broken and that her windshield wiper was not functioning properly, and reported the damage on her DVIR, as she was supposed to do. (Id. at ¶ 67). David Bass learned of the damages to McFay's truck when a customer complained that his telephone line had been torn down by a UPS package car and investigated the complaint by visiting the scene of the incident and interviewing McFay. (Id. at ¶¶ 68-69). Bass observed that the telephone line that the customer stated was torn down was intertwined with the low-hanging tree branches against which McFay's package car had scraped. (Id. at ¶ 69).

When Bass interviewed McFay about the February 28, 2007 incident, she explained that a tree limb had scraped her package car, but that she had no knowledge of a telephone line being pulled down as part of the incident. (Id. at ¶ 70). Based on his belief that McFay was unaware that she pulled a telephone line down, Bass concluded that McFay had not had an "accident" on February 28, 2007, and, therefore, could not be disciplined for failure to report an accident. (Id. at ¶ 64).

UPS found that McFay's incident was distinct and discernible from Plaintiff's accident. (Id.). On March 16, 2007, while Plaintiff was making a delivery to a residence in Leesburg, Georgia, he hit a customer's basketball goal with his package car while backing into the driveway. (Id. at ¶ 40). After Plaintiff hit the customer's basketball goal on March 16, 2007, the goal was visibly out of place because of the way it was positioned on the grass. (Id. at ¶ 41).

After hitting the customer's basketball goal on March 16, 2007, Plaintiff moved the goal back to its original location in the grass. (Id. at ¶ 42). Plaintiff did not report the fact that he had hit the customer's basketball goal on March 16, 2007 to anyone at UPS, nor did he report it on his DVIR for the day in question. (Id. at ¶ 42). Several days after the March 16, 2007 accident involving the customer's basketball goal, the customer in question called and complained about

damage to his basketball goal and an oil spot in his driveway that he believed had been caused by a UPS package car. (Id. at ¶ 43). The customer complaint regarding the damaged basketball goal came to On-Road Supervisor Keith Wright, who contacted the customer and went to his house to investigate. (Id. at ¶¶ 44-45). After making the initial complaint regarding the damaged basketball goal, the customer submitted a follow-up letter in which he provided additional details about the accident. (Id. at ¶ 46). During his visit to the customer's house to investigate the March 16, 2007 accident involving the basketball goal, Wright observed that the basketball goal base had been moved, that there were oil spots on the ground in front of the goal, and that there was brown vinyl paint – like that from a UPS package car – on the goal's rim, which had been bent, apparently by the package car. (Id. at ¶ 47). While investigating the March 16, 2007 accident involving the basketball goal, Wright determined that Plaintiff had been the Package Car Driver who delivered to the customer on the day in question. (Id. at ¶ 48). Wright inspected the package car that Plaintiff had driven on the day of the accident and found scratches on the vehicle at approximately the height of a basketball goal rim. (Id. at ¶ 49).

Wright and Business Manager David Bass met with Plaintiff and his union steward on March 22, 2007, to discuss the March 16, 2007 accident and the subsequent customer complaint. (Id. at ¶ 50). After initially telling Bass and Wright that he did not have anything out of the ordinary to report about his route on March 16, 2007, Plaintiff admitted that he had hit the customer's basketball goal with his package car and failed to report the accident. (Id. at ¶ 51). Based on the results of Wright's investigation and Plaintiff's admission during the March 22, 2007 meeting, Bass made the decision to terminate Plaintiff. (Id. at ¶ 41). At the March 22, 2007 meeting, Bass and Wright terminated Plaintiff and told him that the discharge was based on his failure to report the March 16, 2007 accident. (Id. at ¶ 53).

After the March 22, 2007 meeting, Bass provided Plaintiff with a written letter of discharge, as required by the CBA. (Id. at ¶ 54). The CBA provided a multi-step grievance procedure through which the Teamsters and bargaining unit employees could challenge a disciplinary action or discharge decision by the Company. (Id. at ¶ 30). The first step of the CBA's grievance procedure was an informal, "local" hearing among the employee, the employee's Union representative and appropriate UPS management employees to attempt to resolve the grievance. (Id. at ¶ 31). If a grievance was not resolved at the local hearing, it was subsequently heard by the Southern Region Area Parcel Grievance Committee ("SRAPGC") – a panel made up of an equal number of UPS and Teamsters representatives who were not involved in the underlying events leading up to the grievance, and who had no interest in the outcome of the grievance. (Id. at ¶ 32).

In resolving a grievance, the SRAPGC had the authority to make adjustments to disciplinary and discharge decisions based upon any number of mitigating factors, including an employee's seniority and prior work and disciplinary record. (Id. at ¶ 33). If a grievance was not resolved by the SRAPGC because of a tie vote, it could be appealed to a SRAPGC "Deadlock Panel," which was comprised of UPS and Teamsters representatives who were not involved in the underlying dispute, and who had the authority to resolve the grievance. (Id. at ¶ 34). If a grievance was not resolved by the Deadlock Panel, it could then proceed to binding arbitration. (Id. at ¶ 35).

Prior to the 2007 termination, Plaintiff was discharged in 2005 for failing to complete his job assignment. (Id. at ¶ 36). Following Plaintiff's 2005 discharge, UPS and the Teamsters ultimately agreed through the grievance process to adjust Plaintiff's termination to a suspension without pay. (Id. at ¶ 37). Prior to his discharge in March 2007, Plaintiff was disciplined on

9

nine separate occasions for his failure to follow proper delivery methods or his supervisors' instructions.  (Id. at ¶ 38).  Prior to his discharge in March 2007, Plaintiff received two warning letters and a suspension for attendance problems, as well as two warning letters for failure to follow safe work methods.  (Id. at ¶ 39).  Plaintiff grieved his March 22, 2007 termination through the grievance process contained in the CBA. (Id. at ¶ 40).

During the local level hearing involving UPS, Plaintiff and his Union representatives, Plaintiff admitted that he had, in fact, hit the customer's basketball goal with his package car and failed to report the accident.  (Id. at ¶ 56).  During the local level hearing involving UPS, Plaintiff and his Union representatives, Plaintiff admitted that he was aware of the requirement that drivers report all accidents immediately.  (Id. at ¶ 57).  Plaintiff's grievance relating to his March 22, 2007 discharge was not resolved at the local level hearing, and it was subsequently heard by the SRAPGC.  (Id. at ¶ 58).  None of the members of the six-person SRAPGC panel who heard Plaintiff's grievance relating to his March 22, 2007 discharge had any prior knowledge of the events leading up to Plaintiff's termination, and none of the panel members had any interest in the outcome of the grievance.  (Id. at ¶ 59).  After hearing evidence from both the Company and the Union, including testimony from Plaintiff himself, the grievance panel denied Plaintiff's grievance relating to his March 22, 2007discharge and upheld his termination.  (Id. at ¶ 60).

Plaintiff completed an Equal Employment Opportunity Commission Intake Questionnaire between May and June of 2007.  (Doc. 1-1, Ex. A).  The Questionnaire was received on June 3, 2007.  (Id.)  In response to Plaintiff's Intake Questionnaire, the EEOC sent Plaintiff a letter on July 6, 2007.  (Id. at ¶ 62).  On December 11, 2007, the EEOC sent Plaintiff a letter containing a draft charge of discrimination for him to review, sign, and submit.  (Id. at ¶ 63).  Defendant

alleges that Plaintiff did not file a charge of discrimination with the EEOC until late January 2008, and the "Charge of Discrimination" from the EEOC is dated January 14, 2008. (Doc. 19 at ¶ 61, Doc. 1-2).

## DISCUSSION

### A.   Parties' Arguments

Plaintiff contends that Defendant engaged in disability, race, and sex discrimination against him and this discrimination led to his termination. (Doc. 1). The Court will address each of Plaintiff's claims herein. Defendant denies any allegations of discrimination against Plaintiff and raises two primary arguments in its Motion for Summary Judgment (Doc. 18). First, Defendant argues that Plaintiff's Charge of Discrimination was untimely and that Plaintiff failed to exhaust his administrative remedies and meet the federal prerequisites to suit. (Doc. 18-1). Second, Defendant argues that Plaintiff's claims are without merit and fail as a matter of law. (Id.) In Response, Plaintiff argues that his EEOC Questionnaire should be construed as a charge for the purposes of the statutory charge filling requirement. (Doc. 35). Plaintiff also states that his claims are supported by the evidence and that the Court should find that discrimination occurred based, in large part, on the disparate treatment between Plaintiff and McFay.

### B.   Timeliness of Plaintiff's EEOC Charge of Discrimination

A plaintiff may not sue under Title VII or the ADA unless he first exhausts administrative remedies by filing a timely charge of discrimination with the EEOC. *See* Wilkerson v. Grinnell Corp., 270 F.3d 1314, 1317 (11th Cir. 2001) (Title VII). Here, whether or not Plaintiff satisfied this requirement turns on whether or not his EEOC Intake Questionnaire received on June 3, 2007 should be construed as an EEOC charge. In a non-deferral state, such as Georgia, a charge of discrimination is timely filed if it is filed within 180 days after the

11

alleged act of discrimination. 42 U.S.C. § 12117 (a); 42 U.S.C. § 2000e-5(e)(1); Watson v. Blue Circle, Inc., 324 F.3d 1252, 1258 (11th Cir. 2003). It is undisputed that Plaintiff did not file a Formal Charge with the EEOC within 180 days of the alleged act of discrimination. (Doc. 19).

It is also undisputed that there was no activity for several months between Plaintiff and the EEOC following the completion of Plaintiff's Intake Questionnaire. (Doc. 19). The record suggests that Plaintiff did correspond with the EEOC during the Summer of 2007, for example, around July of 2007, Plaintiff contacted the EEOC regarding the status of his "case." (Doc. 46-3). In response to Plaintiff's inquiry, the EEOC sent Plaintiff a letter on July 6, 2007. (Doc. 46-5). Plaintiff continued to contact the EEOC regarding his case.[3] On December 11, 2007, the EEOC sent Plaintiff a second letter containing a draft charge of discrimination for him to review, sign, and submit. (Id. at ¶ 63). Plaintiff did not file a formal charge of discrimination with the EEOC until late January 2008, and the "Charge of Discrimination" from the EEOC is dated January 14, 2008. (Doc. 1-2).

The more common view the Eleventh Circuit has taken regarding Intake Questionnaires is that, as a "general matter," these questionnaires are "not intended to function as a charge." Pijnenburg v. West Ga. Health Sys., Inc., 255 F.3d 1304, 1305 (11th Cir.2001). Like Plaintiff Street, the plaintiff in Pijnenburg submitted an unsworn intake questionnaire to the EEOC, but never filed a timely verified charge. (Id.) The issue was whether an intake questionnaire could be considered a charge. (Id.) The court held that "intake questionnaires do not satisfy the statutory requirements of an administrative charge." Id. at 1306. However, more recently, the Supreme Court addressed this issue in considering what constitutes a charge. Fed. Express Corp. v. Holowecki, 552 U.S. 389, 401–02, 128 S.Ct. 1147, 170 L.Ed.2d 10 (2008). The standard is as

---

[3] Defendant admits that Plaintiff continued to correspond with the EEOC on an informal basis. (See 18-1 at 13 ("[Moreover, after Plaintiff continued to press the matter with the EEOC . . .")) .

follows: "[i]n addition to the information required by the regulations, *i.e.,* an allegation and the name of the charged party, if a filing is to be deemed a charge it must be reasonably construed as a request for the agency to take remedial action to protect the employee's rights or otherwise settle a dispute between the employer and employee." Id. at 402.

The Court is persuaded to find that Plaintiff's Questionnaire should be construed as a charge for the purposes of its review of this Motion in light of the correspondence between Plaintiff and the EEOC and the Supreme Court's recent holding in Holowecki. In finding that Plaintiff met his administrative requirements, the Court has looked at the record and must also consider the purpose of an EEOC charge, which is to put the Defendant on notice of the existence and nature of the charges against him. EEOC v. Shell Oil Co., 466 U.S. 54, 77 (1984). Regarding notice to Defendant, the Court notes that on April 1, 2009, the EEOC made a Determination on the merits of Plaintiff's Charge and stated that "timeliness and all other requirements for coverage have been met." (Doc. 1-4). The EEOC then issued a Right to Sue Letter to Plaintiff on September 4, 2009. Defendant promptly responded to the EEOC Determination in a letter dated April 17, 2009. (Doc. 46-5). In its letter, Defendant raised the timeliness issue, among other issues, and asked the EEOC to reconsider its Determination and withdraw or dismiss the charge. (Id.).

In reaching its decision that Plaintiff met the administrative requirements in the instant case, the Court relies, in part, on the Holowecki case. In Holowecki, the Defendant did not receive *any* notice of the EEOC charge until after Plaintiff filed her Complaint in District Court. Holowecki, 552 U.S. 389, 400 (2008). There, the Supreme Court did not minimize the effects of the failure of plaintiff to exhaust her administrative procedures in the case and admitted that prejudice did result to Defendant. The Court was persuaded to find that plaintiff's Questionnaire

was a charge by the fact that the EEOC found that the Questionnaire was a charge. The Court further stated that "[t]he agency's determination is a reasonable exercise of its authority to apply its own regulations and procedures in the course of the routine administration of the statute it enforces." Like the Supreme Court in Holowecki, this Court also finds that the EEOC determination should weigh heavily in its analysis in this case. The Court concludes that Plaintiff's Intake Questionnaire met the purposes of the statutory standards and administrative requirements and was a clear request for the agency to take remedial action to protect the employee's rights. Therefore, Defendant's Motion for Summary Judgment on Plaintiff's discrimination claims under Title VII and the ADA as untimely is **DENIED**.

### C. Discrimination under the ADA

Plaintiff has failed to provide sufficient factual support under existing law to withstand summary judgment regarding his claim for discrimination based on disability.[4] Plaintiff asks the Court to find that Defendant discriminated against him based on his description as a "high risk" employee for future on the job injuries. (Docs. 1 and 35). In order to establish a *prima facie* case of discrimination in violation of the ADA, Plaintiff must prove that: (1) he has a disability; (2) he is a qualified individual; (3) he was discharged, and (4) his disability was a substantial or motivating factor that prompted UPS to terminate his employment. Collado v. United States Parcel Serv. Co., 409 F.3d 1143 (11th Cir. 2005). Plaintiff has failed to allege that he is a "qualified individual with a disability." For purposes of the ADA, a disability is: a "physical or mental impairment that substantially limits one or more of the major life activities of [an] individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." In his deposition, Plaintiff stated that he did not have a disability and Plaintiff has

---

[4] The Court notes that Defendants assert Plaintiff abandoned his disability discrimination claim. (Doc. 48 at 9). However, for the purposes of this Motion the Court will address the merits of Plaintiff's claim based on the record under the applicable law.

14

not elsewhere alleged a disability in the record. (*See* Docket, Doc. 18-3 at 97) ("I don't have a disability.").

Having reviewed the record, the Court can find no facts in support of Plaintiff's ADA claim. Moreover, the Court can find no legal authority in this Circuit where a similarly situated Plaintiff was allowed recovery under the ADA based on his classification as a "high risk" employee and Plaintiff has not provided the Court with any legal basis for such claim. Therefore, Plaintiff cannot meet his burden regarding a *prima facie* showing of the first element requiring that Plaintiff have a disability under the statute. Plaintiff has not alleged sufficient facts such that a reasonable jury could find that Defendant discriminated against Plaintiff under the ADA. Therefore, the Court finds that no genuine issue of material fact exists as to whether Plaintiff has a disability or was a disabled person under the ADA at the time of his termination. The Court finds no merit in Plaintiff's argument and, for the reasons stated herein, summary judgment is appropriate as to Plaintiff's ADA Claim. Therefore, Defendant's Motion for Summary Judgment on Plaintiff's discrimination claim under the ADA is **GRANTED.**

D. <u>Discrimination under Title VII</u>

Plaintiff alleges that Defendant discriminated against him based on his race and gender. (Docs. 1 and 35). Plaintiff asserts that UPS employee Phyllis McFay is a proper comparator and received more favorable treatment on account of her race and gender. (Id.) Defendant states that Plaintiff's race and gender discrimination claims must fail because Plaintiff has failed to state a *prima facie* case based on McFay as a comparator. Defendant also states that Plaintiff's claims must fail because Plaintiff failed to rebut Defendant's legitimate, non-discriminatory reason for termination.

Title VII makes it unlawful for an employer to "discharge any individual ... because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1), Wilson v. B/E Aerospace, Inc., 376 F.3d 1079, 1087 (11th Cir.2004). To establish a discrimination claim under Title VII in the absence of direct evidence pursuant to the McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973) burden-shifting analysis employed by the Eleventh Circuit Court of Appeals, a plaintiff must first establish a *prima facie* case and show: "(1) he is a member of a protected class; (2) he was subjected to adverse employment action; (3) his employer treated similarly situated employees outside his class more favorably; and (4) he was qualified to do the job." Maniccia v. Brown, 171 F.3d 1364, 1368 (11th Cir.1999).[5]

Here, it is undisputed that Plaintiff, an African American, is a member of a protected class. (Docs. 1 and 18-1). It is also undisputed that Plaintiff was subjected to an adverse employment action when he was terminated by Defendant on March 22, 2007. (Id.) Regarding the third element of a *prima facie* case, "[i]n determining whether employees are similarly situated . . . it is necessary to consider whether the employees are involved in or accused of the same or similar conduct and are disciplined in different ways." Manniccia, 171 F.3d. at 1368. When considering this element, the law requires that "the quantity and quality of the comparator's misconduct be nearly identical to prevent courts from second-guessing employers' reasonable decisions and confusing apples with oranges." (Id.)

Even if a plaintiff and comparator are similar in some respects, differences in their overall record may render them not "similarly situated" for purposes of establishing a prima facie case. *See, e.g.*, Knight v. Baptist Hosp. of Miami, Inc., 330 F.3d 1313, 1316–19 (11th Cir.2003).

---

[5] Plaintiff's arguments focus primarily on racial discrimination despite the presence of a gender discrimination claim in his Complaint. (Doc. 35). In order to overcome Summary Judgment, Plaintiff must show that the similarly situated comparator was treated more favorably based on race and/or gender. Because the analysis is the same, the Court considers Plaintiff's claims for race and gender discrimination together.

16

In Knight v. Baptist Hospital of Miami, 330 F.3d 1313, 1319 (11th Cir.2003), the Eleventh Circuit Court of Appeals affirmed the grant of summary judgment against the plaintiff by finding that the proffered comparator was not similarly situated. The Court noted that while both employees displayed similar disciplinary histories, the comparator's record was "substantially better" than the plaintiff's regarding the areas of "job performance and tardiness." Id. at 1316-17. In addition, the Court noted that even though the comparator experienced difficulties in terms of job performance and tardiness, the plaintiff's "documented performance and tardiness problems" were substantially worse in "both number and nature." Id. at 1317-1319. In this case, Plaintiff has failed to demonstrate disparate treatment between Plaintiff and comparator employees because they are not "similarly situated in all relevant respects." See Holified v. Reno, 115 F.3d 1555, 1562 (11th Cir. 1997).

Under the law, Plaintiff was required to show that the conduct between Plaintiff and McFay was nearly identical. McCann v. Tillman, 526 F.3d 1370, 1373 (11th Cir. 2008) quoting Maniccia v. Brown, 171 F.3d 1364, 1368 (11th Cir. 1999). As Defendant shows the Court, Plaintiff and McFay both damaged their vehicles and caused property damage. (Docs. 19 and 31). However, these events are distinguishable. McFay believed she only hit a branch (although it actually involved a telephone line) and reported the issue on her DVIR in accordance with Defendant's procedures. (Id.) In contrast, Plaintiff was fully aware that he hit the basketball goal of a customer, and took steps to conceal the accident by moving the customer's property. (Id.) Evidence of damage to Plaintiff's package car consistent with striking the goal was also discovered. (Id.) Plaintiff did not report the accident to Defendant. (Id.) Plaintiff did not voluntarily disclose the accident or damage to the customer's property or to his package car, but

admitted the accident only following formal questioning by Defendant's representatives following a complaint from the customer. (Id.)

The Court finds that the record shows that the conduct of Plaintiff was dissimilar to and more serious than McFay's conduct. UPS's decision to terminate Plaintiff was based on its determination that his conduct, damaging customer property and failing to report the accident, was more egregious than his chosen comparator.[6] A thorough review of the record shows no evidence that McFay was alleged to have committed any substantially similar conduct (*i.e.* failure to report a known accident) as compared to Plaintiff's. Further, no evidence exists that McFay's record shows the history of disciplinary actions, including reprimands and termination, that Plaintiff's employment history reflects.[7]

Summary judgment is appropriate where no other evidence of discrimination is present if Plaintiff "fails to show the existence of a similarly situated employee." Holified, 115 F.3d at 1562. There is simply no genuine issue of material fact to establish that Defendant terminated Plaintiff based on race or gender discrimination.[8] Thus, while Plaintiff can dispute that he

---

[6] A perfect comparator would have held the same position or level of responsibility and similar duties as Plaintiff did at the time of his discharge and engaged in conduct of a quantity and quality nearly identical to Plaintiff's alleged misdeeds, and supervised by the same decision-makers with knowledge of the alleged misdeeds. See McCann v. Tillman, 526 F.3d 1370, 1373 (11th Cir. 2008). However, a more perfect comparator was apparently unavailable in the instant action.

[7] Plaintiff's termination was based on his breach of Defendant's policies when he failed to report the accident. Prior to the 2007 termination, Plaintiff was discharged in 2005 for failing to complete his job assignment. (Doc. 19 at ¶ 36). Following Plaintiff's 2005 discharge, an agreement was reached and termination was modified to a suspension without pay. (Id. at ¶ 37). Plaintiff was also disciplined on nine separate occasions for his failure to follow proper delivery methods or his supervisors' instructions. (Id. at ¶ 38). The record further reflects that Plaintiff received two warning letters and a suspension for attendance problems, as well as two warning letters for failure to follow safe work methods. (Id. at ¶ 39). While the Court need not reach the issue of whether Defendant proffered a legitimate, nondiscriminatory reason for its actions and whether Plaintiff proffered any evidence to show that the reason given was pretextual it notes that in light of Plaintiff's lengthy disciplinary history with Defendant it is unlikely that Plaintiff could overcome Defendant's proffer of a legitimate, nondiscriminatory reason for Plaintiff's discharge.

[8] The Court also notes that Plaintiff's Grievance Hearing did not result in a reversal of his termination or a finding of discrimination. Plaintiff does not contend that any member of the Grievance Committee holds discriminatory animus towards him or that they acted knowingly to promote or enforce any such animus on behalf of Defendant. (*See* Docs. 1 and 35).

engaged in wrongful conduct that was, in his opinion, sufficient basis for termination, even viewed in the light most favorable to Plaintiff, there simply is no genuine issue of material fact sufficient to preclude summary judgment as to Plaintiff's race and sex discrimination claims. Whether or not Defendant's reasons were "prudent or fair" as a business decision, there is no genuine issue of material fact as to Plaintiff's contention that Defendant's reason violated federal law. *See* e.g. Damon v. Fleming Supermarkets of Florida, Inc.,196 F.3d 1354, 1361 (1999) (reversing grant of summary judgment to employer where Plaintiff showed pretext by demonstrating the employee had not actually violated the work rule forming the basis of termination). Accordingly, Defendant's Motion for Summary Judgment (Doc. 18) is **GRANTED** as to Plaintiff's race and gender Title VII claims.

## CONCLUSION

Accordingly, for the foregoing reasons, Defendant's Motion for Summary (Doc. 18) is **GRANTED**. Judgment shall be entered for Defendant as to Plaintiff's claims.

**SO ORDERED**, this  28th  day of September, 2011.

/s/ W. Louis Sands
**THE HONORABLE W. LOUIS SANDS,
UNITED STATES DISTRICT COURT**